AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
### Northern District of California

**FILED**

Aug 23 2023

Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

|  |  |
|---|---|
| United States of America | ) |
| v. | ) |
| TJOMAN BUDITASLIM, | ) |
| a/k/a Joe Lim, | ) |
| a/k/a Joseph Salim, | ) |
|  | ) |
|  | ) |

Case No. 3:23-mj-71269 MAG

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of  Sept. 2 & 8, 2019 & Aug. 12, 2020  in the county of  San Francisco and elsewhere  in the

Northern  District of  California , the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 1343 (3 counts) | Wire Fraud |

This criminal complaint is based on these facts:

See attached affidavit of Special Agent Paul Richard

☑ Continued on the attached sheet.

/s/ via telephone

*Complainant's signature*

Paul Richard, Special Agent, FBI

*Printed name and title*

Approved as to form _____/s/_____
AUSA Christiaan H. Highsmith

Sworn to before me by telephone.

Date:  08/22/2023

*Judge's signature*

City and state:  San Francisco, CA

Hon. Thomas S. Hixson, U.S. Magistrate Judge

*Printed name and title*

## AFFIDAVIT IN SUPPORT OF
## APPLICATION FOR SEARCH WARRANTS & CRIMINAL COMPLAINT

I, Paul A. Richard, a Special Agent with the Federal Housing Finance Agency, Office of Inspector General, being duly sworn, hereby depose and state the following:

## INTRODUCTION

1.      I submit this affidavit in support of an arrest warrant and criminal complaint charging Tjoman BUDITASLIM ("BUDITASLIM") with wire fraud, in violation of 18 U.S.C. § 1343 (the "SUBJECT OFFENSE").

2.      Further, I submit this affidavit in support of a search warrant under Federal Rule of Criminal Procedure 41 for evidence of the SUBJECT OFFENSE, as described in Attachment B, pursuant to the protocols described in Attachment C, to search:

> a.  the premises known as 1327 South Mayfair Avenue, Daly City, California (the "SUBJECT PREMISES"), more particularly described in Attachment A-1; and
>
> b.  the person and immediate effects of Tjoman BUDITASLIM, more particularly described in Attachment A-2.

The particular items to be searched for and seized from the SUBJECT PREMISES and BUDITASLIM are specified in Attachment B to each warrant, also filed herewith and incorporated by referenced.  All seized electronic devices will be searched according to the protocol set forth in Attachment C.

3.      As set forth in greater detail below, BUDITASLIM was the ringleader of a mortgage fraud scheme.  As part of the scheme, BUDITASLIM qualified his clients for home mortgage loans by creating and submitting false documents to mortgage origination companies to falsely inflate his clients' income.  BUDITASLIM created and caused to be created fake judicial divorce decrees and child support/alimony checks to show mortgage origination companies that his clients earned thousands of dollars in child support.  But these divorce documents were fraudulent—BUDITASLIM created the divorce documents and listed ex-spouses who were never married to his clients.  BUDITASLIM knew that these documents were false and he knew that his clients were never married to the spouses listed in the divorce decrees and never received the child support/alimony payments that BUDITASLIM submitted to

1

mortgage origination companies.  BUDITASLIM also created and caused to be created fake checks showing significant alimony and child support payments that did not exist.  By submitting these false divorce documents and fraudulent checks, BUDITASLIM qualified his clients for home mortgages they could not qualify for using legitimate means.

4.      The requested search for the SUBJECT PREMISES shall include: (i) all rooms and storage spaces that are associated with the SUBJECT PREMISES; (ii) any containers, locked or unlocked, located within or attached to the SUBJECT PREMISES; and (iii) as specified in Attachment B to the warrant for the SUBJECT PREMISES, any cell phones, computers, or other digital media devices found in the SUBJECT PREMISES.

5.      The information in this affidavit has become known to me through: (1) my training and experience; (2) my review of bank and mortgage loan records; (3) my discussions with other law enforcement officers; (4) my review of oral and written reports and other documents prepared by law enforcement officers; (5) physical surveillance conducted by myself, other federal agents, and/or law enforcement officers; (6) witness and victim statements; and (7) subpoenaed financial records.

6.      Because the purpose of this affidavit is to set forth only those facts necessary to establish probable cause for the issuance of the requested criminal complaint and search warrants at the premises listed below, I have not described all the relevant facts and circumstances of which I am aware.  In addition, when I rely on statements made by others, such statements are set forth in part and in substance unless otherwise indicated.  Facts not stated in this affidavit are not being relied upon to reach my conclusion that the requested search warrants should be issued.  Unless stated otherwise, the opinions stated herein are based on my training and experience and conversations with other law enforcement officers, including those officers experienced in fraud cases.  This affidavit does not set forth all my knowledge about this matter; it is intended to only show there is sufficient probable cause for the requested warrant.  This investigation is being conducted jointly with Federal Housing Finance Agency-Office of Inspector General and Housing and Urban Development-Office of Inspector General.

## AGENT BACKGROUND

7.      I am an investigative or law enforcement officer of the United States, within the meaning of 18 U.S.C. § 2510(7), and am empowered by law to conduct investigations

of and to make arrests for offenses enumerated in Title 18 of the United States Code, among other offenses.

8.    I am a Special Agent ("SA") with Federal Housing Finance Agency, Office of Inspector General ("FHFA-OIG") in the Sacramento Field Office.  I have been a duly sworn federal law enforcement special agent with FHFA-OIG since February 2014.  I have been a sworn law enforcement officer for more than 31 years working for the U.S. Department of Housing and Urban Development – Office of Inspector General, the U.S. Postal Inspection Service, the Upper Merion Police Department, and the U.S. Park Police.  I have conducted, as well as participated in, hundreds of criminal investigations including but not limited to, mortgage fraud, bank fraud, wire fraud, perjury, computer crimes, sex crimes, homicide, theft, robbery, burglary, and narcotics related crimes.  During the course of these investigations, I have conducted interviews with witnesses, victims, and suspects.  I have gathered no less than one hundred items of evidence and arrested no less than one hundred suspects for a variety of crimes. I have been the affiant on more than twenty-five search warrants in both federal and state court in California and other states.  Each of these warrants were successfully served and led to the recovery of pertinent evidence.

9.    In January 2003, I received a Master's Degree in Criminal Justice from West Chester University in West Chester, Pennsylvania.  In October 2014, I became a Certified Fraud Examiner ("CFE") through the Association of Certified Fraud Examiners ("ACFE").  Since February 2014, I have had over sixty hours of training from the Mortgage Bankers Association as well as several courses on interview and interrogation. In July of 2018, I received a certification from the Association of Certified Anti-Money Laundering Specialists as an Anti-Money Laundering Specialist.

10.    As a FHFA-OIG SA, my duties include investigating fraud, waste, and abuse as it relates to the Federal Housing Finance Agency which includes Fannie Mae, Freddie Mac, and the Federal Home Loan Banks.  I routinely interview witnesses, suspects, and complainants.  I perform database searches and obtain and review escrow and loan files.  I prepare and execute search and arrest warrants in both state and federal courts.

## APPLICABLE LAW

11.    Title 18, United States Code, Section 1343 provides: "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or

property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

## FACTS SUPPORTING PROBABLE CAUSE

### A.  Background of the Investigation

12.     BUDITASLIM is a 50-year-old real estate professional living in Daly City, California.  Until 2019, when his license was revoked, BUDITASLIM held a California real estate broker's license.  BUDITASLIM worked with an individual referred to herein as J.S. at Scott Keys Properties (a/k/a Century 21 Scott Keys, TJ & Scott Management).  J.S. died in approximately February 2023.[1]

13.     In approximately June 2017, the California Department of Real Estate ("CA-DRE") began an investigation into BUDITASLIM and J.S. after receiving complaints filed by borrowers claiming that they had paid BUDITASLIM and J.S. upfront fees that were supposed to go toward down payments and/or closing costs for the purchase of a home. According to the complaints, BUDITASLIM and J.S. collected upfront fees but failed to use the borrowers' money towards down payments and/or closing costs and failed to return the money to the borrowers when the borrowers were unable to purchase homes.  As a result of the CA-DRE investigation, BUDITASLIM and J.S. had their real estate broker licenses revoked in 2019.

### B.  Law Enforcement Authorities Tie BUDITASLIM to 64 Fraudulent Loans Funded Between July 2015 and April 2022

14.     In approximately 2018, law enforcement authorities began investigating BUDITASLIM and J.S. for mortgage fraud.  The law enforcement investigation revealed that BUDITASLIM, J.S., and their coconspirators created and submitted fraudulent documents to mortgage lenders in order to help their clients obtain mortgage loans to which the borrowers would not have qualified for but for the submission of fraudulent documents representing that their income was far higher than it actually was.  Law enforcement authorities identified approximately 64 mortgage loans—some dating as far back as July 2015—involving

---

[1] A death certificate for J.S. was filed in Sonoma County (California) on February 16, 2023.

BUDITASLIM and J.S. that were extended to borrowers based on fraudulent income documents. As part of this investigation, authorities identified approximately 24 loans extended to borrowers based on fraudulent documents submitted by BUDITASLIM and his coconspirators that were insured by the U.S. Federal Housing Administration ("FHA") for $12,258,077.00. These loans were funded between July 2015 and April 2022 to purchase residences in eight Northern California counties.

15.     BUDITASLIM's mortgage fraud scheme involved numerous coconspirators who worked with BUDITASLIM and J.S. to create and then submit to mortgage lenders fake divorce documents, fake cancelled checks, and altered bank account statements. The fraudulent documents were designed to make it appear as if the borrowers were receiving income from child support and alimony that was used to qualify the borrowers for home mortgage loans they would not have qualified for based on their true income.

16.     As part of the investigation, authorities obtained search warrants from California State Courts to search email accounts associated with BUDITASLIM, J.S., and other individuals involved in creating and submitting fraudulent documents to qualify BUDITASLIM's clients for home mortgage loans. These emails revealed that BUDITASLIM was directing a group of coconspirators, including an individual referred to herein as T.H., to create fraudulent divorce decrees, child support payment checks, and bank account statements and submit those fraudulent documents to mortgage loan originators in order to obtain mortgage loans for BUDITASLIM's clients. BUDITASLIM and J.S. collected fees from clients as part of the process of obtaining loans for them or received real estate broker commissions from the sale of the properties.

17.     During the investigation, law enforcement interviewed an individual referred to herein as A.C., who worked under BUDITASLIM. A.C.'s father, an individual referred to herein as A.C.M., had been a BUDITASLIM client and introduced his son to BUDITASLIM. A.C. expressed interest in a real estate career to BUDITASLIM, who offered A.C. an opportunity to gain some real estate experience. Per A.C., BUDITASLIM and J.S. worked representing home buyers, and BUDITASLIM went by "Joe" and "Joseph Salim."

BUDITASLIM showed A.C. how to give tours of houses for sale and eventually sent him out to show houses to prospective buyers on his own.[2]

18.     Per A.C., BUDITASLIM told A.C. his goal was to help the Hispanic community get into real estate and buy property.  BUDITASLIM did not speak Spanish so A.C. would translate between the client and BUDITASLIM if the client did not speak English.  A.C. believed BUDITASLIM advertised specifically to the Hispanic community.  A.C. worked for BUDITASLIM for over a year and met J.S. and several other people who worked for BUDITASLIM.  According to A.C., BUDITASLIM ran the show and would tell J.S. what to do, like "a puppeteer."  A.C. knew BUDITASLIM to do much of his work from his home.  BUDITASLIM handled all the loan aspects of the transactions, including collecting documents and dealing with the lenders.  BUDITASLIM paid A.C. inconsistently and often paid him with checks that bounced. A.C. knew BUDITASLIM to use the email addresses fasttrackhomeloans@gmail.com and teamcoordinator2@gmail.com and the phone number 415-661-7282.  A.C. stated that BUDITASLIM was very secretive about how he was able to qualify people for mortgage loans and eventually he stopped working for him because he felt BUDITASLIM was "sketchy."

19.     During the investigation, law enforcement interviewed a number of BUDITASLIM's clients about the mortgage loan applications that BUDITASLIM had submitted on their behalf.  In September 2019, law enforcement authorities interviewed A.C.M., who had contacted J.S. in February 2017 to inquire about purchasing a residential property in Novato, CA.  Thereafter, J.S. introduced A.C.M. to BUDITASLIM.  A.C.M. met in person with J.S. and BUDITASLIM, whom A.C.M. referred to as "Joe Lim," and provided them with his full name, Social Security Number, and tax returns.  About a week later, BUDITASLIM, using the name Joe Lim, called A.C.M. and said that the loan would not be a problem but that he needed $10,000 to lock in the interest rate.

20.     When agents showed A.C.M. his loan application listing base monthly income of $5,700 and $11,732 in alimony/child support, A.C.M. said he did not have alimony/child support income, had never been married to anyone other than his current wife, and

---

[2] Based on my training, experience, and knowledge of this investigation, I believe that the information attributed herein to A.C. is true and reliable.  Based on my knowledge of this investigation, I further believe that A.C. worked under the direction and management of BUDITASLIM.  However, I believe that A.C. minimized his involvement in the mortgage fraud scheme when speaking with law enforcement authorities.

did not have children with anyone other than his current wife.  When shown page four of the loan application, which said that information for the application was provided during a telephone interview with V.B., the loan originator, A.C.M. said that he had never spoken with V.B. and did not know her.  When shown a divorce judgment from Marin County Superior Court, A.C.M. said he did not know the woman and children listed as his wife and children in the document.  According to Marin County Superior Court records, the case number does not exist nor does a case involving the parties listed in the document.  Finally, when shown copies of three checks purportedly paying A.C.M. child support from his fictitious ex-wife, A.C.M. said he had never seen the checks and did not deposit the checks.

21.     Agents interviewed another BUDITASLIM client, J.P.H.A., who relayed a similar sequence of events as A.C.M.   Per J.P.H.A., his mother recommended J.S. as a real estate agent because he had helped her buy a house.  J.S. had also assisted J.P.H.A.'s cousin in buying a condo.  Thereafter, J.S. helped J.P.H.A. purchase a residence in Napa.  The timeline of events was straightforward.  After deciding to purchase the house, J.P.H.A. met in person with A.C. to provide requested documents and sign several blank pieces of paper.  A.C. said that doing so would be quicker and avoid back and forth with signing documents.  When investigating agents showed J.P.H.A. his loan application declaring $2,000 in base income and $8,525 in other income with an explanation stating that $9,803.75 was from alimony/child support, J.P.H.A. stated that he had never seen the form.  When shown a copy of the divorce decree/judgement stating that J.P.H.A. had divorced a women referred to herein as A.S. in 2013 and would receive $8,525 in monthly child support for two children, J.P.H.A. stated that he had never been married to A.S., did not have any children other than his one child with his current wife, and had never seen the divorce decree.

22.     Agents interviewed three other BUDITASLIM and J.S. clients who obtained home mortgage loans working with BUDITASLIM and J.S.  These three additional clients reported substantially similar stories as A.C.M. and J.P.H.A.—specifically, they were unaware of the divorce documents and child support/alimony income reported in their loan applications and contained in their loan files and that such divorces never happened, and they did not receive the child support/alimony income included in their mortgage applications.

C.  **April 2023 Fraud Referral from Loan Origination Company 1**

23.     In April 2023, Loan Origination Company 1 reported to law enforcement authorities that it had identified approximately 49 mortgage loans which contained income fraud. Loan Origination Company 1 reported that it had conducted an internal investigation and discovered that several of its loan officers had been working with BUDITASLIM and J.S. to obtain mortgage loans for borrowers using falsified income documents.  The falsified documents included fake divorce documents, fake cancelled checks, and altered bank account statements. The 49 suspected fraudulent loans overlapped with some of the 64 loans identified previously by law enforcement authorities, as discussed above.

24.     Loan Origination Company 1 has already repurchased 10 of the fraudulent loans for approximately $6.7 million.  Loan Origination Company 1 estimates that it will be able to resell these loans for approximately 70% of the total repurchase amount and therefore Loan Origination Company 1 estimates that it will lose no less than approximately $2 million as a result of BUDITASLIM's fraud scheme.  To the extent that Loan Origination Company 1 is required to repurchase additional fraudulent loans, its losses associated with this mortgage fraud scheme likely will increase.

25.     In addition to analyzing loan files and email communications, law enforcement authorities have reviewed financial records for BUDITASLIM and others associated with the mortgage fraud scheme.  Based on the investigation to date, I believe that BUDITASLIM profited from the mortgage fraud scheme discussed herein in the following ways: (1) by charging clients fees to obtain mortgage loans for residences they wanted to buy; (2) by obtaining money directly from loan officers who originated BUDITASLIM's client's mortgages; and (3) by receiving a portion of real estate broker commissions.

D.  **Identification of Email Addresses Used by BUDITASLIM and his Coconspirators**

a.     **BUDITASLIM's Email Accounts**

26.     As discussed above in the paragraphs summarizing A.C.'s statements to law enforcement, BUDITASLIM used the email addresses fasttrackhomeloans@gmail.com and teamcoordinator2@gmail.com.  Authorities have compiled additional information to corroborate BUDITASLIM's use of fasttrackhomeloans@gmail.com.  Information provided by Google, Inc. shows that the email address  fasttrackhomeloans@gmail.com was opened on January 10, 2013

and the person opening the account used the name "Joe Lin" and provided a birth date of identical to BUDITASLIM's birth date.[3]  Further, the recovery email provided was buditaslim@yahoo.com and the recovery phone number was 415-712-4802.  In a complaint made to the CA-DRE about BUDITASLIM, the complainant provided a copy of the business card given to him, which listed "Tjoman Buditaslim (Joe Lim)," Account Executive, with the email address fasttrackhomeloans@gmail.com.

27.     This investigation has also revealed that BUDITASLIM used email address buditaslim@yahoo.com.  Information provided by Yahoo shows that email was opened on August 13, 1997, and the person opening the account used the name "Joe Lim" provided a date of birth identical to BUDITASLIM's date of birth and listed the gender as "male."  Recovery emails associated with the Yahoo account include, but are not limited to: tsalimsf@icloud.com, joe@c21scottkeys.com, and fasttrackhomeloans@gmail.com.  According to Yahoo, other identities associated with buditaslim@yahoo.com include: buditaslim01, Buditaslim, and others.

28.     This investigation has also revealed that BUDITASLIM used email address teamcoordinator2@gmail.com.  Information provided by Google shows that email was opened on August 19, 2013, and the person opening the account used the name "Joseph Salim" and provided a date of birth identical to BUDITASLIM's.  The recovery email provided was fasttrackhomeloans@gmail.com.

**b.     T.H.'s Email Account**

29.     T.H. used an email account referred to herein as the "T.H. Gmail Account."  Information provided by Google shows that the T.H. Gmail Account was opened on March 1, 2019, and the person opening the account listed the same last name as T.H. (but a different first name) and provided a date of birth that is the same as T.H.'s date of birth.  Based on my training, experience, and knowledge of this investigation, I believe T.H. controlled and used the T.H. Gmail Account.

30.     According to Google records obtained during this investigation, the T.H. Gmail Account was associated with a Google Pay account and a Google Drive storage account.

---

[3] BUDITASLIM'S date of birth is personal identifying information and has been removed from this affidavit.  Law enforcement has BUDITASLIM's date of birth on file.

One billing and shipping address listed for the Google Pay account was an address in San Francisco that is also listed on T.H.'s California Driver's license, issued October 6, 2018.

31. According to records provided by Apple, T.H. is associated with an Apple email account referred to herein as the "T.H.@me.com Account" that lists the SUBJECT PREMISES as the home address for T.H.. Based on my training, experience, and knowledge of this investigation, I believe T.H. controlled the T.H.@me.com Account.

### c.  J.M.'s Email Accounts

32. The individual referred to herein as J.M. is a California real estate agent who worked with BUDITASLIM and others to create and submit false income documents to qualify BUDITASLIM's clients for mortgage loans they would not have legitimately qualified for based on their legitimate income. J.M. is listed as the real estate agent of record on some of the escrow files for properties BUDITASLIM helped clients obtain mortgages to purchase. Further, financial documents show that J.M. transferred money to BUDITASLIM. J.M. used an email account referred to herein as the "J.M. 23184 Gmail Account." Information provided by Google, Inc. shows that this account was opened on September 8, 2012, and the person opening the account used J.M.'s name but a different birthday. The recovery phone number for the J.M. 23184 Gmail Account belongs to J.M., who is a CA-DRE licensed realtor. Investigators have also tied J.M. to an email account referred to herein as the "J.M. Intero Email Account." A Google search of the J.M. Intero Email Account links to the website that includes J.M.'s name in the URL and which displays a photo of J.M. and lists his CA-DRE real estate license number and the J.M. Intero Email Account address.

### d.  J.T.'s Email Account

33. The individual referred to herein as J.T. worked as a Loan Officer for Loan Origination Company 1. J.T. was the loan officer affiliated with a significant number of mortgages extended to BUDITASLIM clients based on false documentation. Loan Origination Company 1 provided the work email address referred to herein as the "J.T. Home Loans' Email Address." J.T. used the J.T. Home Loans' Email Address to facilitate his job as a Loan Officer with Loan Origination Company 1.

34. J.T also used an email address referred to as the "J.T. 19 Gmail Account." Information provided by Google shows that the J.T. 19 Gmail Account was opened on October 3, 2014, and the person opening the account used J.T.'s birthdate, but a different first name.

According to Google records obtained during this investigation, the J.T. 19 Gmail Account was associated with a Google Drive storage account that contained many photographs of J.T. as well as a photograph of J.T.'s California Driver's license and his social security card.

### E.   Criminal Complaint Counts 1-3: Wire Fraud, in Violation of 18 U.S.C. § 1343

35.   Law enforcement authorities have analyzed many of the loan files associated with the fraudulent loans discussed above.  For many of these loans, law enforcement authorities have also obtained via search warrant email accounts for BUDITASLIM, T.H., J.M., and J.T. in which they communicated about creating fraudulent divorce decree documents and fraudulent child support checks and then submitted the fraudulent documents to Loan Officers at Loan Origination Company 1, including J.T., to obtain loans for clients.  Criminal Complaint counts one, two, and three are set forth below.  Each count corresponds to a specific email made in furtherance of the mortgage fraud scheme discussed herein.

36.   Law enforcement review of emails, loan files, and associated mortgage documents show that BUDITASLIM and others attempted to make the divorce documents appear authentic by using the names and addresses of real people when creating the fraudulent ex-spouses listed on Judgement for Dissolution of Marriage documents and falsified personal checks.  Law enforcement analysis has also revealed that BUDITASLIM conducted property searches to identify real people who owned property and then he would then use those real people's names and personal identifying information on the falsified documents.  In at least one case, as detailed below, BUDITASLIM appears to have obtained a copy of an authentic document recorded on the real property in order to review the real person's signature and attempt to forge it on the falsified personal checks.

### F.   The Creation and Submission of Fraudulent Documents to Secure a Loan for the Santa Rosa Property

37.   On November 8, 2019, Chicago Title Company closed on the purchase of a home referred to herein as the "Santa Rosa Property."  Loan Origination Company 1 originated the loan used to purchase the property.  Law enforcement reviewed the relevant loan files and related documents, which listed the buyer as a female referred to herein as the "Santa Rosa Buyer" and the Loan Officer an individual referred to herein as "L.R."  The loan application contained in the loan file was signed by the Santa Rosa Buyer and L.R. and indicated that the Santa Rosa Buyer earned $3,644.59 monthly in base employment income and received $10,770

per month in alimony/child support income.  Both incomes were used to qualify the Santa Rosa Buyer for the loan.  The alimony/child support income was fraudulent and based on fake documents created and submitted by the defendants.

38.     The loan file contained a copy of a Marriage Settlement Agreement and Judgement indicating that the Santa Rosa Buyer was married on March 17, 2003, separated on June 7, 2007, and that the divorce was finalized on December 10, 2007.  The document is purported to be filed in Contra Costa County Superior Court under case number MSD07-965017.  The document further states that the couple had two children together and indicated that the purported ex-husband (referred to herein as "M.M.") was ordered to pay the Santa Rosa Buyer child support of $5,385 monthly for each child, a total of $10,770 per month.

39.     The Marriage Settlement Agreement and Judgement is counterfeit but contains signatures for the Santa Rosa Buyer and M.M.  Contra Costa County Superior Court reported that case number MSD07-965017 does not exist.  Authorities interviewed M.M., who stated that he has never been married and does not know the Santa Rosa Buyer.  M.M. further stated that he does not have any children and does not pay child support.  M.M. also pointed out that on the reported wedding date, March 17, 2003, he would have been 11 years old.  M.M. did not sign the document and did not give permission for anyone to use his name or sign for him.

40.     In addition, the loan file contained copies of 27 canceled checks that appear to have been written from M.M. to the Santa Rosa Buyer from a Chase Bank account ending in the last four digits -1828.  All the checks are in the amount of $10,770 and are dated monthly from August of 2017 through October 2019.  These checks were submitted to Loan Origination Company 1 as proof of the child support payments allegedly being made from M.M. to the Santa Rosa Buyer.  All 27 checks have M.M. name and home address printed on them and are purportedly signed by M.M., but when shown the checks M.M. stated he did not make any payments to the Santa Rosa Buyer, does not have an account at Chase Bank, and the signature on the checks are not his.

41.     The investigation conducted in this case shows that the loan application, counterfeit Marriage Settlement Agreement and Judgement, and fake checks were submitted via email to Loan Origination Company 1 by T.H. at BUDITASLIM's direction.

42.     On July 28, 2019, T.H. emailed Loan Officers J.T. and L.R. with the subject "New file for [Name of Santa Rosa Buyer]. [Santa Rosa Property Address] Santa Rosa

95407" and contained 111 pages of attached documents.[4]  The attached documents included the loan application, a purchase contract, credit report, paystubs, preliminary title report, the Marriage Settlement Agreement and Judgement, three of the fake checks, and 2017 and 2018 tax documents for Guzman.

43.     The next day, July 29, 2019, T.H. emailed Loan Officers J.T. and L.R. an email address purported for the Santa Rosa Buyer.  I believe, however, that the email address was controlled by T.H., because the account was created on June 14, 2019 (just one month prior) using as a recovery email address and recovery telephone number an email address and telephone number law enforcement knows to be associated with T.H.

44.     One month later, on August 29, 2019, Loan Officer J.T. emailed BUDITASLIM, copying T.H., with the Santa Rosa Buyer's name as the subject.  The body of the email starts with "Hi Joe," and discusses conditions needed to process the Guzman loan.  One of the conditions listed is "2 year full history for the Child support Canceled checks."  Based on my training, experience, and knowledge of this investigation, I believe that the Loan Officer was informing BUDITASLIM that in order to originate the loan for the Santa Rosa Buyer BUDITASLIM would need to provide Loan Origination Company 1 with proof of child support payments in the form of child support checks covering a two-year period.

*Count One: September 2, 2019, Email from Buditaslim to Coconspirators*

45.     Days later, on September 2, 2019, in response to Loan Officer J.T.'s email, BUDITASLIM emailed the real estate broker J.M. and J.S. with the subject line "Cancel check [Santa Rosa Buyer].pdf."  The body of the email is blank.  Attached to the email are copies of 22 checks drawn on the aforementioned Chase Bank account ending -1828 with M.M.'s name and home address printed on the checks.  Check number 134, dated May 1, 2019 and with a canceled check stamp on the back dated May 2, 2019, is filled out and made payable to "[Santa Rosa Buyer]" in the amount of $10,770 and contains a signature for M.M.  The memo line reads "Maria and Roberto," the purported names of the couple's children.  The other 21 checks in the attachment also have M.M.'s name and home address printed on them and canceled check stamps on the back with dates listed for consecutive months from 8/3/2017 to 4/2/2019, but the pay to, date, memo, signature lines, and payment amount categories are all blank.  The stamps on the backs of the checks purportedly indicate that the blank checks were cashed.  Based

---

[4] Buyer name and property address redacted to protect personal identifying information.

on my training, experience, and knowledge of this investigation, I believe that the checks were all fake, used M.M.'s name and address to perpetuate mortgage fraud, and were never cashed. Further, based on my training and experience, I believe that this email traveled in interstate or foreign commerce because email servers for the internet service providers at issue here are typically housed outside of California. Further, I believe that BUDITASLIM sent this email for the purpose of executing a scheme and artifice to defraud—namely, the mortgage fraud scheme discussed herein.

46.     One day later, on September 4, 2019, J.M. emailed BUDITASLIM, copying T.H., with the Santa Rosa Buyer's name as the subject of the email. The email attachment was titled "Canceled Checks" and consisted of the same 22 checks sent to J.M. two days earlier except the 21 previously blank checks were completely filled out—payable to the Santa Rosa Buyer, in the amount of $10,770, dated, and with "Maria and Roberto" written in the memo section—but the signature line was still blank. Based on my training, experience, and knowledge of this investigation, I believe that J.M. understood that BUDITASLIM was asking J.M. to fill out the fraudulent checks and return them to BUDITASLIM so that the BUDITASLIM and J.M. could qualify the Santa Rosa Buyer for a mortgage loan based on false documents and a falsely inflated income.

47.     Two days later, on September 6, 2019, T.H. emailed Loan Officer J.T. with the subject line "[Santa Rosa Buyer] Child Support Checks, 21 months." The body of the email stated in part: "Here are the requested documents for the divorce. Let me know if this file needs anything else." An attachment to the email contained copies of a total of 25 checks all drawn on the purported Chase Bank account ending -1828. The attachment contained the 22 checks described above plus three additional checks. All the checks used M.M.'s name and address and were now completely filled out in the amount of $10,770, dated, with "Maria and Roberto" written in the memo section, a canceled check stamp, and now, M.M.'s signature.[5] Based on my training, experience, and knowledge of this investigation, I believe that T.H. was emailing Loan Officer J.T. 25 fraudulent checks using M.M.'s identity and personal information to fraudulently obtain a mortgage loan from Loan Origination Company 1.

---

[5] One of the 25 checks attached to T.H.'s September 6, 2019 email was check 142. During this investigation, agents obtained the contents of T.H.'s Google Drive. One of the documents found in T.H.'s Google Drive was a copy of check 142 unsigned and with the memo section blank.

48.     On September 16, 2019, BUDITASLIM emailed Loan Officer J.T., copying T.H., with subject line "cancel check august ([Santa Rosa Buyer's last name]) PTD." The email stated, "Hi Al, Enclosed please find the August cancel check. Please let us know if you receive it: our internet has been up and down since this morning.  Thank you for your help. Joe."  Attached to the email was a copy of check 142 drawn on the purported M.M. Chase Bank account ending in -1828, payable to the Santa Rosa Buyer, dated August 1, 2019, in the amount of $10,770.  A copy of this same check was included in the attachment for the September 6, 2019, email from T.H. To Loan Officer J.T. described above.

49.     On October 27, 2019, J.S. emailed J.M. with subject line "[Santa Rosa Buyer's name] checks."  The email stated: "Hi [J.M.], Please find attached two additional checks that need to be filled out.  One month included for sample. Remember the date is written with dashes not slashes.  Thanks! Jack." Attached to this email was check 142 completely filled out and signed along with checks 144 and 145 blank on the front but endorsed on the back and with the canceled check stamp.  Based on my training, experience, and knowledge of this investigation, I believe that the mortgage fraud conspirators were trying to finish the final fake checks needed to complete the child support/alimony income loan condition for Loan Origination Company 1's mortgage for the Santa Rosa Buyer.

50.     One day later, on October 28, 2019, J.M. emailed BUDITASLIM and J.S. with subject line "Re: [Santa Rosa Buyer's name] checks."  The body of the email stated: "Hi Jack, Attached please find checks.  Please call if you need something else. Regards." This email contained an attachment titled "[Santa Rosa Buyer's name].pdf."  The attachment contained copies of two checks, numbered 144 and 145, supposedly drawn on the Chase Bank account ending in -1828, which used M.M.'s name and address.  Both checks were filled out in the amount of $10,770, dated, with "Maria and Roberto" (the purported names of the children) written in the memo section, and a canceled check stamp.  The signature section was blank.

51.     Hours later, on October 28, 2019, T.H. emailed Loan Officer J.T. with subject line "[EXTERNAL] [Santa Rosa Buyer] Conditions" stating: "Hey there, Here are the conditions for [Santa Rosa Buyer's last name]."  Attached were exact copies of checks 144 and 145 described above; however, the checks now contained M.M.'s purported signature.

52.     The Final Settlement Statement, dated November 8, 2019, for the Santa Rosa Property escrow, showed a real estate commission of $20,250 paid to "listing agent" J.S.

15

On November 11, 2019, according to bank records, check number 549026058 for $20,250 from Chicago Title from escrow for the Santa Rosa Property was deposited into J.S.'s Wells Fargo Bank account ending x8227 ("Wells Fargo Account x8227").  On November 13, 2019, Wells Fargo Account x8227 check number 111 was written to T.H. for $4,000 with memo line stating the name of the Santa Rosa Buyer.  On November 13, 2019, T.H. deposited the check into his bank account, a Wells Fargo Bank account ending in x9807.

53.     Law enforcement has reviewed bank records for Wells Fargo Account x8227, held solely in J.S.'s name in November 2019, and has confirmed that BUDITALSIM benefitted from payments made to and from that account.  For example, in November 2019, BUDITALSIM and J.S. jointly rented the SUBJECT PREMISES, and rent for the SUBJECT PREMISES was paid from Wells Fargo Account x8227.  Further, bank records show that credit card bills for BUDITASLIM were in part paid from Wells Fargo Account x8227.  And, as noted above, BUDITASLIM took over power-of-attorney for Well Fargo Account x8227 after J.S. died in February 2023.  Accordingly, based on my training, experience, and knowledge of this investigation, I believe that BUDITASLIM received payment for obtaining a home mortgage loan for the Santa Rosa Buyer by causing the creation and submission of fraudulent income documents and then receiving payment out of escrow for the Santa Rosa Property via J.S.'s Wells Fargo Account x8227.

54.     In addition, the Final Settlement Statement for the Santa Rosa Property escrow showed an additional real estate commission in the amount of $21,000 paid to an individual referred to herein as W.S.  On November 8, 2019, Chicago Title check number 549026059 for $21,000 from the Santa Rosa Property escrow was deposited into W.S.'s Chase Bank account ending in x6020 ("Chase Account x6020").  Days later, on November 12 and 13, 2019, Chase Account x6020 sent five payments totaling $3,300 to BUDITASLIM.  Documents obtained from Chase Bank show that J.S. is a signer on Chase Account x6020.  Based on my training, experience, and knowledge of this investigation, I believe that J.S. and BUDITASLIM used Chase Account x6020 held in W.S.'s name to funnel money from property sales and mortgage origination to themselves and their coconspirators.

**G.  The Creation and Submission of Fraudulent Documents to Secure a Loan for the San Francisco Property**

55.     On October 8, 2019, Old Republic Title Company closed on the purchase of a home referred to herein as the "San Francisco Property."[6]  Agents obtained the loan file from Loan Origination Company 1 and reviewed relevant documents related to mortgage origination for the San Francisco Property.  These records show that an individual referred to herein as the "San Francisco Buyer"[7] purchased the home and that L.R. served as the Loan Officer (L.R. was also the listed Loan Officer for the Santa Rosa Property).

56.     The loan file included, among other documents, the loan application signed by L.R. and the San Francisco Buyer indicating that the San Francisco Buyer earned $5,874.27 per month in base employment income and $9,980 per month in alimony/child support income.  Loan Origination Company 1 used both incomes to qualify the San Francisco Buyer for a mortgage loan.

57.     The loan file also contained a copy of a Marriage Settlement Agreement and Judgement indicating that: the San Francisco Buyer was divorced from an individual referred to herein as "N.W." on February 21, 2011; the couple had two children together, Andrew and Andy; and N.W. was ordered to pay the San Francisco Buyer child support of $4,999 monthly for each child, a total of $9,980 per month.[8]  The document is purported to be filed in Alameda County Superior Court under case number MSD11-063998.

58.     The Marriage Settlement Agreement and Judgement is a counterfeit document, although it contains purported signatures for the San Francisco Buyer and N.W.  Alameda County Superior Court officials stated that case number MSD11-063998 does not exist.  Authorities interviewed N.W., who stated that she does not know the San Francisco Buyer and has never been married to anyone with his name.  N.W. stated that she does not have any children named Andrew and Andy, does not pay child support, did not sign the Marriage Settlement Agreement and Judgement, and did not give permission for anyone to use her name or to sign for her.

59.     In addition, the loan file contained copies of four canceled checks which appear to have been written from N.W. to the San Francisco Buyer drawn on a U.S. Bank

---

[6] Address removed to prevent disclosure of personal identifying information; the exact address is on file with investigators.

[7] The San Francisco Buyer's name and personal identifying information is removed to prevent disclosure of sensitive, personal identifying information, which is on file with law enforcement.

[8] N.W. is a real person and her name has been removed to protect sensitive, personal identifying information.

account ending in x8648.  All the checks are in the amount of $9,980 and are dated monthly from June of 2019 through September 2019.  These checks were submitted to Loan Origination Company 1 as proof of the San Francisco Buyer's child support income.  All four checks have N.W.'s name, home address, and purported signature.  When shown the checks, N.W. stated that she did not make any payments to the San Francisco Buyer, does not have an account at U.S. Bank, and that the signature on the checks was not hers.

60.     Law enforcement has obtained email accounts for BUDITASLIM, J.S., and others involved in creating and submitting fraudulent documents used to obtain a mortgage from Loan Origination Company 1 so that the San Francisco Buyer could purchase the San Francisco Property.  Based on my training, experience, and knowledge of this investigation, I believe that BUDITASLIM and others located N.W. and used her personal identifying information in furtherance of the mortgage fraud scheme described in this affidavit.

61.     On August 13, 2019, BUDITASLIM emailed Loan Officers J.T. and L.R. at Loan Origination Company 1, copying J.S. and T.H., with subject line "New client [San Francisco Buyer] purchase $725,888."  The email stated: "We are submitting offer for our new client [San Francisco Buyer], property in San Francisco.  Offer price: $725,888….  Offer is due tomorrow (Multiple Offers)….  Working the file and will send you the complete package.  Thanks, Joe."  Later the same day, J.T. responded, "Sounds good Joe. Please send package as soon as possible so that we don't lose time if they are in contract by tomorrow."  Based on my training, experience, and knowledge of this investigation, I believe that BUDITASLIM was emailing the Loan Officers to tell them that he was representing a buyer who could soon be under contract to purchase the San Francisco Property and that BUDITASLIM would be working to submit a loan application and the necessary accompanying documentation in the coming days.

62.     On August 15, 2019, BUDITASLIM exchanged emails with a real estate agent, D.F., who purported to represent the San Francisco Buyer.  During the email exchange, D.F. emailed BUDITASLIM a Purchase Agreement for the San Francisco Property signed by the seller and the seller's real estate agent.  Based on my training, experience, and knowledge of this investigation, I believe that BUDITASLIM was working to obtain a mortgage loan for the San Francisco Buyer so that the San Francisco Buyer could purchase the San Francisco Property.

63.     On August 15, 2019, J.S. emailed an employee at the Chicago Title Company, an individual referred to herein as "J.Y.," copying BUDITASLIM, with the subject line listing a property in Piedmont, California, stating: "Joe is meeting with the owner of the subject property ([N.W.]) Friday and needs a copy of the Grant Deed.  Property profile says the Document # is xxx001. Joe is copied on this email."[9]  Based on my training, experience, and knowledge of this investigation, I believe that BUDITASLIM and J.S. were emailing J.Y. to obtain official documents for N.W. in order to use her personal identifying information on fraudulent documents they later caused to be submitted to Loan Origination Company 1.

64.     On August 16, 2019, Chicago Title Company employee K.Q. responded with the following email: "Please see attached Grant Deed per your request." Attached was a Grant Deed signed by N.W.

65.     On August 17, 2019, BUDITASLIM emailed Chicago Title Company employees K.Q. and J.Y., and J.S., stating: "I am so sorry, I need the Deed of Trust (not the grant deed). [J.S.] made mistake. We want the deed of Trust because of the lender want to see the terms of their loan for refinancing."  Based on my training, experience, and knowledge of this investigation, I believe that BUDITASLIM was lying when he said he needed to see the terms of N.W.'s loan for refinancing; instead, I believe BUDITASLIM sought to obtain N.W.'s personal identifying information to falsely represent that she was paying child support/alimony to the San Francisco Buyer.

66.     On August 18, 2019, BUDITASLIM emailed T.H. with subject line "123 [San Francisco Buyer's last name] (Please use this one (POINT) REVISED – UPDATED" which included a 302 KB attachment entitled "POINT.PCF."  On August 19, 2019, T.H. emailed Loan Officers J.T. and L.R., with BUDITASLIM copied in the BBC line, with subject line "Complete File for [San Francisco Buyer]" and attaching 117 pages of documents, including, the falsified loan application, a purchase contract, credit report, paystubs, preliminary title report, the fraudulent Marriage Settlement Agreement and Judgement, three fake checks, and 2017 and 2018 tax documents for the San Francisco Buyer.  Based on my training, experience, and knowledge of this investigation, I believe that T.H. was sending fraudulent documents to Loan

---

[9] Document number on file with law enforcement but redacted here to protect sensitive, personal identifying information.

Origination Company 1 loan officers at BUDITASLIM's direction to qualify the San Francisco Buyer for a mortgage loan his legitimate income did not otherwise qualify him for.

67.     On September 6, 2019, D.F., the San Francisco Buyer's purported real estate agent, sent BUDITASLIM a series of 11 emails, each containing a bank statement for a Wells Fargo Bank account ending in x3401 ("Wells Fargo Account x3401") with the names of an individual referred to herein as "M.C.M." and the San Francisco Buyer as account owners. The statements span September 2018 through August 2019.

68.     On September 8, 2019, BUDITASLIM emailed J.S. with subject line "12 Months Bank Statements to Proof ([M.C.M.] Mama Pay the Mortgage in Oakland ([San Francisco Buyer's last name]).pdf."  The attachment contained bank statements for Wells Fargo Account x3401 but with only M.C.M. listed as the account owner and only for statements range from July 2018 to July 2019 (the statements that did not overlap were July 2018, August 2018, and August 2019).  For the months in common, the statements appear to be exactly the same as the statements sent from D.F. to BUDITASLIM two days earlier except the San Francisco Buyer's name was removed from the statements and recurring transfers of $1300 to Wells Fargo Account x3401 from AGURERA Y had been changed to appear to come from AGURERA A. Based on my training, experience, and knowledge of this investigation, I believe that BUDITASLIM was altering Wells Fargo Account x3401 bank statements so that the San Francisco Buyer was not listed as an account holder in submissions to Loan Origination Company 1.  I further believe that BUDITASLIM was trying to represent to Loan Origination Company 1 that the San Francisco Buyer was not paying any portion of the mortgage payments for the house he co-owned with his mother and for which he was also listed on the mortgage.  I also believe that BUDITASLIM altered the sender name for the $1300 recurring transfers in order to help the San Francisco Buyer qualify for a mortgage from Loan Origination Company 1.

*Count Two: September 8, 2019, Email from Buditaslim to J.S.*

69.     Minutes later, on September 8, 2019, BUDITASLIM emailed J.S., copying himself on a different email address, stating:

> Please help to audit the bank statement on [San Francisco Buyer].
>
> **SUMMARY:**
> [San Francisco Buyer] **cannot** be JOINT ACCOUNT on this bank statement. [San Francisco Buyer]
> can give money/transfer to
> [M.C.M.] (MaMa) is as seen on Last statement August 2019.

Girlfriend is ok ([A.Y.]) : in statement appear as **"AGUIRERA Y"** account associate ending
XXX3176
There are $1,300 recurring transfer money every month to Mama Account is Girlfriend's Brother:
[A.A.]: in statement appear as **"AGUIRERA A"**

**Item that need to look at bank statement:**

• Please make sure inside on each page bank statement: **AGURERA Y** checking XXX3176 (If there are
transaction)
• Please make sure recurring transfer $1,300 under name AGURERA A
• *Originally_ this account is JOINT between MaMa and [San Francisco Buyer]. We must make
sure His name is not in the Ownership of the account on each pages (On right corner or left top
corner).* EXCEPT: [San Francisco Buyer's first name] can transfer money/give money to MaMa as
showed on August 2019.

Please call me if you have any questions.

Joe
415-340-3939

70.     Based on my training, experience, and knowledge of this investigation, I
believe that in the email set forth above BUDITASLIM was asking J.S. for help and giving J.S.
instructions on how to alter Wells Fargo Account x3401 bank statements to qualify the San
Francisco Buy for a mortgage from Loan Origination Company 1.  Specifically, BUDITASLIM
was asking J.S. to remove the San Francisco Buyer's name from bank statements and to alter the
$1300 recurring payments to Wells Fargo Account x3401 from "Agurera Y" so that the
statements looked like the payments were coming from "Agurera A" instead.  Based on my
training and experience, I believe that this email traveled in interstate or foreign commerce
because email servers for the internet service providers at issue here are typically house outside
of California.  Further, I believe that BUDITASLIM sent this email for the purpose of executing
a scheme and artifice to defraud—namely, the mortgage fraud scheme discussed herein.

71.     Also on September 8, 2019, BUDITASLIM sent the altered bank statements
to D.F. asking him to help "Audit" the forms with the same list of instruction as the previous email
referenced above and stating "Our assistant day off and we just want you to have flash look…"

72.     One date later, on September 9, 2019, T.H. emailed Loan officer J.T., with
a BCC to BUDITASLIM, subject line referencing both the San Francisco Buyer and the San
Francisco Property and attaching the altered bank statements as well as other documents.

73.     On September 16, 2019, BUDITASLIM emailed Loan Officer J.T.,
copying T.H., with J.S. and real estate agent D.F. on the BCC line, with subject "[San Francisco
Buyer's last name] PTD Conditions."  BUDITASLIM wrote: "Hi All, Please lets get the doc out

on this one too."  BUDITASLIM attached a document named "PTD Conditions ([San Francisco Buyer's last name]).pdf," which included check number 1060 drawn on U.S. Bank account ending in x8648 in N.W.'s name, with her address on the check, with her signature on the check, payable to the San Francisco Buyer for $9,980 with "Andy and Andrew" written in the memo section.  The back of Check 1060 had the San Francisco Buyer's signature and a canceled check stamp dated September 4, 2019.

74.     On October 5, 2019, the San Francisco Buyer obtained a cashier's check made out to J.S. for $13,163.13, which J.S. deposited into Wells Fargo Account x8227 on October 7, 2019.  On October 8, 2019, escrow closed on the San Francisco Property.  Escrow documents for the San Francisco Property show that real estate agent D.F. was paid a $12,291.90 real estate commission in connection with the sale of the San Francisco Property.

## H.  The Creation and Submission of Fraudulent Documents to Secure a Loan for the Finley Avenue Property

75.     On April 26, 2021, Chicago Title Company closed on the purchase of a home on Finley Avenue in Santa Rosa, California (the "Finley Avenue Property").  A review of relevant business documents listed the buyer as an individual referred to herein as the "Finley Avenue Buyer" and the Loan Officer as an individual referred to herein as "G.R.," who worked at Loan Origination Company 1.

76.     Law enforcement obtained and reviewed the Finley Avenue Property loan file, signed by the Finley Avenue Buyer and G.R.  The loan application indicated that the Finley Avenue Buyer was making $3,813.33 per month in base employment income and receiving $5,275 per month in alimony/child support income.  Both income sources were used to qualify the Finley Avenue Buyer for the mortgage loan.

77.     The loan file also contained a copy of a Marriage Settlement Agreement and Judgement indicating that the Finley Avenue Buyer divorced D.P. on August 28, 2017.  The document is purported to be filed in Alameda County Superior Court under case number HF172000177 and states that the couple had two children together (named Victoria and Maria) and that D.P was ordered to pay the Finley Avenue Buyer child support of $5,275 monthly.  The Marriage Settlement Agreement and Judgement is counterfeit but contained signatures for the

Finley Avenue Buyer and D.P.  Alameda County Superior Court officials told agents that case number HF172000177 does not exist.

78.     The loan file also contained copies of 13 canceled checks apparently written by D.P. to the Finley Avenue Buyer drawn on a Chase Bank account ending in x1421 ("Chase Account x1421").  All the checks are in the amount of $5,275 and are dated monthly from March of 2020 through March 2021.  These checks were submitted to Loan Origination Company 1 as proof of the child support payments.  All 13 checks contained in the loan file have D.P.'s name and home address printed on them and are purportedly signed by D.P.

79.     Agents obtained a copy of D.P.'s death certificate, which shows that D.P. died on October 14, 2020.  Four of the checks purportedly written and signed by D.P. were written after his death.

80.     In addition to the loan file documents, law enforcement authorities have also reviewed email accounts associated with the creation and submission of fraudulent documents to Loan Origination Company 1 to qualify the Finley Avenue Buyer for a mortgage.

81.     On July 12, 2020, BUDITASLIM emailed an individual referred to herein as H.S. with subject line "Divorce Decree for New Client: [Finley Avenue Buyer]."  The email itself was blank it included two attachments: (1) "Divorce Decree for [D.C.D.L.P.].docx," (2) and "New Client Order DV [Finley Avenue Buyer].pdf."  The divorce decree attachment was a copy of Judicial Form FL-180 for case number HF13858567 from Alameda County for D.C.D.L.P. and D.H.  The "New Client Order DV [Finley Avenue Buyer]" attachment consisted of 11 pages and included name and address information for the Finley Avenue Buyer's purported ex-husband D.P. and a 2018 tax return, copy of a California driver's license, credit report, and signatures for the Finley Avenue Buyer.  Based on my training, experience, and knowledge of this investigation, I believe BUDITASLIM was directing H.S. to create a fake divorce decree document for the Finley Avenue Buyer using the personal identifying information of D.P.

82.     H.S. replied to BUDITASLIM the next day, July 13, 2020, stating: "I made the 6-page document, and left the 2-page document in advance, now only the parts that need to be scanned and printed are missing. I go to sleep and tomorrow I do the checks. Can you verify if they are okay?" There were two attachments to the email: (1) "F180 [Finley Avenue Buyer].docx," and (2) "FL180 (Divorce Decree) [Finley Avenue Buyer].pdf."  The first attachment is a six-page Marriage Settlement Agreement between the Finley Avenue Buyer and

D.P. under case number HF172000177 from Alameda County.  This document has a signature for an attorney, C.L.—indeed, C.L.'s signature was on the FL-180 BUDITASLIM sent H.S. on July 12, 2020—but the signature lines for the Finley Avenue Buyer and D.P. were blank.  The second attachment is a two-page document which appears to be a Judgement FL-180 form for case number HF172000177 for the dissolution of the marriage between the Finley Avenue Buyer and D.P.  The Court stamp and judicial officer sections of the document are blank.

83.     Approximately one month later, on August 11, 2020, J.S. emailed H.S., copying BUDITASLIM, with subject "[Finley Avenue Buyer]," stating: "Joe asked me to email you regarding checks needed.  We currently have 3 months checks for this file, but we need a total of 6 months.  3 months checks are attached for you to build on."  Attached to the email were the following checks: #2110 with a canceled check stamp dated June 2, 2020; #2117 with a canceled check stamp dated July 6, 2020; and #2120 with a canceled check stamp dated August 3, 2020.  All three checks had D.P.'s name and address printed on the front with the pay to the order of, amount, signature and memo lines blank.  The back of the checks had a canceled check stamp and a signature for The Finley Avenue Buyer.  Based on my training, experience, and knowledge of this investigation, I believe that this email was asking H.S. to fill out the fraudulent child support checks purportedly from D.P. to the Finley Avenue Buyer so that BUDITASLIM could have the fraudulent checks submitted to Loan Origination Company 1 to obtain a mortgage loan for the Finley Avenue Buyer.

84.     On August 12, 2020, H.S. emailed J.S. and BUDITASLIM: "ACTUALLY WE HAVE JUN/JUL/AUG. SO TO COMPLETE 6 MONTHS I MADE NOW: MAR/APR/MAY." Attached to the email were copies of the following checks: #2104 with a canceled check stamp dated April 6, 2020; #2100 with a canceled check stamp dated March 5, 2020; and #2108 with a canceled check stamp of May 6, 2020.  All three checks have D.P.'s name and address printed on the front with the pay to the order of, amount, signature and memo lines blank.  The back of the checks had the canceled check stamp and the Finley Avenue Buyer's signature.

*Count Three: August 12, 2020 Email from BUDITASLIM to Coconspirator*

85.     Later the same day, August 12, 2020, BUDITASLIM emailed H.S. and J.S. with subject "Page 6 of 6 DV (needs Signature from [Finley Avenue Buyer's first name]).pdf" and reading: "Please help to put [Finley Avenue Buyer] signatures on DV. (Her

signature attached). We are ready to send to the bank after you finish on additional 3 Months (Total 6 checks). Thanks, Joe." There are two attachments to the email: (1) page 6 of 6 from the FL-180 divorce decree form with the signature for C.L. and now a signature for D.P. but with the Finley Avenue Buyer's signature line blank, and (2) a document containing 24 digital signatures for the Finley Avenue Buyer, one signature for each month in 2019 and 2020, respectively. Based on my training, experience, and knowledge of this investigation, I believe that BUDITASLIM was emailing a coconspirator, H.S., and directing him to fraudulently place the Finley Avenue Buyer's signature on the signature page of a false divorce decree in order to qualify her for a mortgage loan she would not have otherwise qualified for. Further, based on my training and experience, I believe that this email traveled in interstate or foreign commerce because email servers for the internet service providers at issue here are typically housed outside of California. Further, I believe that BUDITASLIM sent this email for the purpose of executing a scheme and artifice to defraud—namely, the mortgage fraud scheme discussed herein.

86.     On August 12, 2020, BUDITASLIM emailed J.S., subject line "Divorce [Finley Avenue Buyer] (need correction).pdf." The body of the email was blank but there was an attachment titled "Divorce [Finley Avenue Buyer] (need correction).pdf." That attachment was a copy of the FL-180 divorce decree for the Finley Avenue Buyer and D.P. which now contained handwritten comments on changes needed on the form.

87.     Approximately ten minutes later, J.S. emailed H.S., copying BUDITASLIM, with subject line "Divorce [Finley Avenue Buyer] (need correction).pdf." The body of the email said: "We need a few corrections to the divorce – see attached. Text to be changed is highlighted and change written in. Thanks for the checks by the way – received." The attachment to the email appears to be the attachment BUDITASLIM emailed J.S. approximately ten minutes earlier—the divorce decree with handwritten notes requesting specific changes to the document.

88.     H.S. replied the next day to J.S. and BUDITASLIM: "WORD FIXED. TAKE A LOOK." The email had an attached entitled "F180 [Finley Avenue Buyer].docx," which was a six-page FL-180 Marriage Settlement Agreement with all the corrections requested the previous day filled out and with the Finley Avenue Buyer's signature on the last page.

89.     On August 14, 2020, J.S. emailed Loan Officer J.T. and BUDITASLIM with subject line referencing the Finley Avenue Buyer and the Finley Avenue Property and

reading: "Hi [J.T.], Please find subject file attached. Escrow has been opened, but no Prelim yet."  The email contained 69 pages of attached documents, including the falsified loan application, a purchase contract, credit report, paystubs, preliminary title report, the Finley Avenue Buyer's California driver's license, bank statements for the Finley Avenue Buyer's Travis Credit Union account ending x0571, the counterfeit Marriage Settlement Agreement and Judgement, five fake child support checks from D.P. dated March 1, 2020, consecutively to August 1, 2020 (but missing a May check), and the Finley Avenue Buyer's 2017 and 2018 tax documents.

90.     The records in this case reflect that there was a significant delay in finalizing the loan approval for and the purchase of the Finley Avenue Property.  On February 4, 2021, BUDITASLIM emailed the Finley Avenue Buyer, copying J.S., asking her for updated paystubs, two months of recent bank statements, and her driver's license.  Less than two hours later, the Finley Avenue Buyer emailed BUDITASLIM: "Hi. Attached is all you requested, two months statements, One month paystub, W2 2020, Driver's license renewal."  She attached December 2020 and January 2021 statement from Travis Credit Union account x0571 with a December 31, 2020, ending balance of $967.05 and a January 31, 2021, ending balance of $936.80.  BUDITASLIM forwarded the email to Loan Officer J.T. and J.S.

91.     On February 5, 2021, BUDITASLIM emailed Loan Officer J.T., copying J.S., with subject line "[Finley Avenue Buyer]."  The body of the email was blank attached to the email was a California interim driver's license for the Finley Avenue Buyer, a 2020 W2 and four paystubs for the Finley Avenue Buyer, a purchase contract, the completed divorce decree between the Finley Avenue Buyer and D.P., and six checks purported to be drawn on D.P.'s Chase Bank account ending in x1421.  Four of those checks were allegedly written and signed by D.P. after this death.  Based on my training, experience, and knowledge of this investigation, I believe that this email traveled in interstate or foreign commerce because at least some of the email servers between which the emails traveled were located outside of California.  Further, based on my training, experience, and knowledge of this investigation, I believe that BUDITASLIM sent this email to J.T. knowing that the divorce decree and six checks were fraudulent and that BUDITASLIM submitted them to Loan Origination Company 1 in order to qualify the Finley Avenue Buyer for a mortgage loan she would not have qualified for based on her legitimate income.

92.     Also on February 5, 2021, BUDITASLIM sent two emails to J.S.  The first email's subject line named the Finley Avenue Buyer and her attached January 2021 credit union account statement, but the body of the email was blank.  The attachment to the email consisted of an altered version of the Finley Avenue Buyer's January 2021 Travis Credit Union account x0571 statement.  The altered statement contained an ending balance that had been changed from $936.80 to $11,751.47.  Further, a transaction dated January 7, 2021, was changed from "Point of Sale Withdrawal 100418 CEVRON/ALLIED CLEAN FNAPA CAUS" with a debit of $7.29 to "ATM Deposit xxxxx xxxx xxxx90 3263 CLAREMONT WAY NAPA CAUS" with a credit of $5,275.00.  The second email's subject line named the Finley Avenue Buyer and her attached December 2020 credit union account statement.  The body of the email was also blank.  The email attachment consisted of an altered version of the Finley Avenue Buyer's December 2020 statement from her Travis Credit Union account ending in x0571.  One alteration was that the ending balance was changed from $967.05 to $6,499.43.  Another alteration was that a transaction dated December 9, 2020 was changed from "Point of Sale Withdrawal 395709389556 YSI*SUNDANCE AT VALLEJOJ0916-3575312 CAUS" with a debit of $257.38 to "ATM Deposit xxxxx xxxxx xxxx90 3263 CLAREMONT WAY NAPA CAUS" with a credit of $5,275.00.  Based on my training, experience, and knowledge of this investigation, I believe that BUDITASLIM caused these alterations in the credit union account statements in order to make the statements appear to reflect that the Finley Avenue Buyer had deposited the fake child support checks that BUDITASLIM had created and submitted to Loan Origination Company 1.

93.     Approximately three minutes later, on February 5, 2021, BUDITASLIM sent two emails to Loan Officer J.T., copying J.S.  The first email's subject line was "[Finley Avenue Buyer] and her January 2021 credit union account statement and "(PLEASE WAIT UNTIL [J.S.] SAID OK TO USE) Not being audit yet."  The Finley Avenue Buyer's altered January 2021 Travis Credit Union account x0571 statement was attached.  The second email's subject line named the Finley Avenue Buyer and her December 2020 credit union account statement and also read "(PLEASE WAIT UNTIL [J.S.] SAID OK TO USE) Not being audit yet."  The Finley Avenue Buyer's altered December 2020 Travis Credit Union account x0571 statement was attached.

94.     Later that same day, J.S. replied to the BUDITASLIM email above: "There is one line item on January statement that needs to be changed."  A few hours later, BUDITASLIM emailed Loan Officer J.T., copying J.S., stating: "Hi al, All ready to go." Followed by a happy face emoji.  The email attachment was another version of the altered January 2021 statement for the Travis Credit Union account ending x0571.  The difference between this version and earlier version was the transaction data for the January 7, 2021, ATM deposit was that the ATM deposit number was changed.

95.     On February 18, 2021, BUDITASLIM emailed E.L.R., copying J.S. with The subject line of the email was "Cancel Check [Finley Avenue Buyer]---MARCH 2020 to August 2020---I already made from Sept to Feb (See Attached)." The body of the email was blank, but the email had three attachments.  One document consisted of the following checks from purported ex-husband D.P.'s purported Chase Bank account x1421: #2121, #2122, #2123, #2126, #2127, and #2129.  All six checks had a cancelled check stamps dated consecutive months from September 2020 through February 2021.  Also included in the attachment was a second copy of check #2121 with handwritten notes describing how to make checks with different dates.

96.     Later the same day, E.L.R. sent a series of six emails replying to BUDITASLIM.  Each email had attached one check purportedly drawn on the D.P. Chase Bank account ending x1421.  The checks were numbered 2105, 2111, 2112, 2114, 2115, and 2118. All six checks had a canceled check stamp on the back showing a cancel date of consecutive months from March 2020 through August 2020—all after D.P.'s death.

97.     On February 22, 2021, J.S. emailed Loan Officer J.T. and BUDITASLIM with subject line "[Finley Avenue Buyer] Checks."  J.S. wrote: "Hi [J.T.], Please find attached the additional 6 months checks (030120-080120) – the same ones you picked up the other night)."  The email's attachment consists of copies of checks 2105, 2111, 2112, 2114, 2115, and 2118 completely filled out with the Finley Avenue Buyer listed as the payee, $5,275.00 listed in the amount, "Victoria and Maria" in the memo line, and with D.P.'s name and home address printed on the front top left.

98.     On March 8, 2021, Loan Officer J.T. emailed the Finley Avenue Buyer, BUDITASLIM, and J.S. with subject line "URGENT – Needed items – Happy Monday [Finley Avenue Buyer's first name]," asking for her February credit union account statement and two

most recent pay stubs.  Later the same day, the Finley Avenue Buyer replied to J.T.'s email, including BUDITASLIM and J.S., writing: "attached is the February statement & last two pay stubs."  The email attached the Finley Avenue Buyer's February 2021 Travis Credit Union account x0571 statement showing a monthly balance of $708.85.  BUDITASLIM responded asking for the Finley Avenue Buyer to send another version of the account statement in PDF format downloaded directly from the credit union's website.  The Finley Avenue Buyer responded the same day attaching the requested PDF version of her February 2021 account statement showing an ending balance of $708.85.

99.     On March 9, 2021, BUDITASLIM emailed J.S. an altered version of the Finley Avenue Buyer's February 2021 Travis Credit Union account x0571 statement.  The alterations included changing the ending balance for the account from $708.85 to $16,802.68 and changing a transaction on February 4, 2021, from "Point Of Sale Withdrawal 75071 BONFARE MARKEY 36 VALLEJO CAUS" with a debit of $4.16 to "ATM Deposit 56348 94558 567790 3263 CLAREMENT WAY NAPA CAUS" with a credit of $5,275.  The alterations made it appear that the Finley Avenue Buyer was actually cashing the purported child support checks.

100.     On March 12, 2021, BUDITASLIM emailed J.S., copying Loan Officer J.T. an attachment consisting of check #2130, dated March 1, 2021, purportedly drawn on D.P.'s Chase Bank account x1421, made out to the Finley Avenue Buyer in the amount of $5,275, containing D.P.'s signature3, with Victoria and Maria written in the memo section, and with D.P.'s name and home address printed the top front left portion of the check.  The back of the check contained a signature for the Finley Avenue Buyer and a canceled check stamp dated March 5, 2021.

101.     On April 12, 2021, Loan Officed J.T. emailed the Finley Avenue Buyer, BUDITASLIM, and J.S. indicating that the loan would close that week and asking the Finley Avenue Buyer to send over her most recent pay stub and her March 2021 credit union statement.  Minutes later, J.T. emailed BUDITASLIM and J.S. but not the Finley Avenue Buyer, with subject line "[Finley Avenue Buyer] – Missing docs."  The email stated:

> Hello my friends,
>
> Missing docs to get CTC by Wedneday.
>
> - Most recent paystub - Address changed
> - Travis CU - March - DV income in there
> - Cancelled check for April

102.    On April 15, 2021, the Finley Avenue Buyer replied to Loan Officer J.T.'s email referenced above, copying BUDITASLIM and J.S., and attaching, as J.T. requested, her most recent paystub and most recent credit union statement.  The month-ending balance on the Finley Avenue Buyer's Travis Credit Union x0571 statement for March 2021 was $1,700.10.

103.    On April 17, 2021, J.S. emailed Loan Officer J.T and BUDITASLIM with subject line "[Finley Avenue Buyer]." The email stated: "Attached you will find. March Bank Statement. Latest Pay Stub. April DV Check."  The attachments included exactly what J.T. had asked for on April 12: an altered copy of the Finley Avenue Buyer's March Travis Credit Union account x0571 statement including the following alterations: changing the ending monthly balance from $1,700.10 to $23,105.19 and changing a transaction from March 9, 2021, from "Point Of Sale Withdrawal 930132 COSTO GAS #0132 VALLEJO CAUS" with a debit of $36.26 to "ATM Deposit Travis CU 1769 Toulumne Dr VALLEJO CA US" with a credit of $5,2750.  Based on my training, experience, and knowledge of this investigation, I believe these alterations were made to make the account statement appear to Loan Origination Company 1 as if the Finley Avenue Buyer was actually cashing the purported child support checks.

104.    The final settlement statement for the Finley Avenue Property escrow shows a real estate commission of $4,300 paid to the listing agent, J.S.  On April 29, 2019, the title company wired $4,300 into J.S. Wells Fargo Account x8227.  As discussed previously herein, BUDITASLIM benefitted from deposits into J.S.'s Wells Fargo Account x8227 because the account paid BUDITASLIM's rent at the SUBJECT PREMISES and some of BUDITASLIM's credit card bills.

### I.    **BUDITASLIM and T.H. Live and Work at the Subject Premises**

105.    An email dated September 25, 2019, between J.S. and representative from Kenny Realty contains an attachment consisting of a lease agreement showing J.S. and BUDITASLIM as the tenants of the SUBJECT PREMISES.  Per the lease, the rent is set at $4,195 per month and T.H. is listed as an additional tenant.  Agents have reviewed two checks drawn on Wells Fargo Account x8227 made out to Kenny Realty in the amount of $4,195.00 with the address of the SUBJECT PREMISES written on the memo line.

106.    Further, authorities have obtained documentation that T.H. lists the SUBJECT PREMISES as his home address for Apple email account travis.james@me.com.

107.    Agents also reviewed a document titled Relation Change Application from Wells Fargo Bank dated February 16, 2023, for Wells Fargo Account x8227.  The documents list J.S. as the account owner and grants BUDITASLIM power of attorney for the account.  The application lists the SUBJECT PREMISES as the mailing address for the account and is signed by BUDITASLIM on February 16, 2023.  As noted previously, a death certificate for J.S. was filed on February 16, 2023.

108.    Further, this investigation has revealed that BUDITASLIM and others have been using the SUBJECT PREMISES to conduct real estate business.  During the course of this investigation, agents have discovered emails arranging the signing of mortgage loan documents at the SUBJECT PREMISES on at least seven different occasions between February 2021 and June 2022.  In addition, law enforcement has conducted interviews in which witnesses have stated that BUDITASLIM conducts business out of his home.

109.    In addition, authorities have observed that first class mail has been delivered to the SUBJECT PREMISES addressed to BUDITASLIM, J.S., T.H., and others within the past 60 days.

110.    On August 8, 2023, authorities observed an individual who appeared similar to the photo on file with the California Department of Motor Vehicles for BUDITASLIM exit the SUBJECT PROPERTY, enter a vehicle, and drive away.  A short time later the same individual—believed to be BUDITASLIM—returned in the vehicle, parked, and entered the residence.

111.    I know from my training and experience that business and financial records can be maintained in either paper or electronic format. I also know that individuals keep these kinds of records for a long time, and in many cases, indefinitely, for various purposes, including for tax purposes.  In this case there is probable cause to believe that the SUBJECT PREMISES will contain records of relevant client information, mortgage loan application materials and supporting documents, bank records, and other financial accounts.

112.    Based on my training and experience, and my conversations with other law enforcement officers, I know that individuals involved in fraudulent schemes often use cellular telephones and other electronic devices to communicate with conspirators and others regarding their illegal activity, including to request and/or receive information to be used in the scheme.  These communications can take various forms, including text messages, instant

messages, voice messages, and emails, among other forms of communication. This electronic information can be stored for long periods of time on devices.

113.   Based on my training and experience, I know that individuals who use cellular telephones often keep those devices on their person at all times, or in close proximity, because such devices are portable and facilitate easy communication between individuals and/or access to goods, services, and information over the Internet, including via numerous mobile applications.  Based on the foregoing, there is probable cause to believe that BUDITASLIM will have a cellular telephone/mobile device on his person or in close proximity.  Accordingly, the applied for-warrants would authorize federal agents to search BUDITASLIM's person for the purpose of seizing and searching a cellular telephone/mobile device.

## TRAINING AND EXPERIENCE REGARDING DIGITAL DEVICES

114.   As described above and in Attachment B, this application seeks permission to search for records that might be found at the SUBJECT PREMISES, in different forms. One form in which the records might be found is data stored on mobile phone, mobile device, computer's hard drive, or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B ).

115.   Probable cause. I submit that if a computer or storage medium is found on the SUBJECT PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

   a.   Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

   b.   Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space that is in space on the storage medium that is not currently being used by an active file-for long periods of time before they are overwritten.

In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media-in particular, computers' internal hard drives-contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

e. Based on actual inspection of other evidence related to this investigation, including spreadsheets, financial records, invoices, land records, loan documents, and government records, I am aware that computer equipment was used to generate, store, create, alter and print documents used in furtherance of the SUBJECT OFFENSES. There is reason to believe that there is a computer system currently located at SUBJECT PREMISES.

116. Forensic evidence. As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the SUBJECT PREMISES because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the

storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For

example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.  A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of computer-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

35

117.    Necessity of seizing or copying entire computers or storage media. In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, inc1uding all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a.   The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.   Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.   Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

118.    Nature of examination.  Based on the foregoing, and consistent with Rule 4l(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection to determine whether it is evidence described by the warrant.

119.    In addition, there is probable cause to believe that the computer and its storage devices, the monitor, the keyboard, mouse, printer, scanner and modem are all instrumentalities of the crimes set forth herein and should all be seized as such.

## UNLOCKING DEVICES USING BIOMETRIC DATA

120.    The warrant I am applying for would permit law enforcement to obtain from certain individuals the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure pursuant to this warrant.  I seek this authority based on the following:

a.    I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b.    If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c.      If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID."  During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

d.      In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

e.      As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

f.      I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours and the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement

personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

g.      In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any individual, who is found at the Subject Premises and reasonably believed by law enforcement to be a user of the device, to unlock the device using biometric features in the same manner as discussed above.

h.      Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of BUDITASLIM and T.H., if T.H. is found at the SUBJECT PREMISES and reasonably believed by law enforcement to be a user of the device, to the fingerprint scanner of the device; (2) hold the device in front of the face of those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

## CONCLUSION

121.    Based upon the information above, I respectfully submit that there is probable cause to believe that BUDITASLIM has committed the SUBJECT OFFENSE—i.e., the crime of wire fraud, in violation of 18 U.S.C. § 1343.   Accordingly, I respectfully request that the Court issue the proposed criminal complaint and arrest warrant.   In addition, based on the information above, I respectfully submit that there is probable cause to believe that the SUBJECT PREMISES and BUDITASLIM, as described in Attachment A-1 and A-2, will reveal

39

the items described in Attachment B, which are evidence, contraband, fruits and instrumentalities of violations of the SUBJECT OFFENSE.  Therefore, I also respectfully request that the Court issue the proposed search warrants for the SUBJECT PREMISES and BUDITASLIM's person.

## REQUEST FOR SEALING

      122.    Since this investigation is continuing, disclosure of the search warrant, this affidavit, and/or application and the attachment thereto will jeopardize the progress of the investigation.  Disclosure of the search warrant at this time would seriously jeopardize the investigation; as such a disclosure would give the suspects an opportunity to destroy evidence, change patterns of behavior, notify confederates, or flee or continue their flight from prosecution. Accordingly, I request that the Court issue an order that the search warrant, this affidavit in support of application for search warrant, the application for search warrant, and all the attachments thereto be filed under seal until further order of this Court.

      I declare under penalty of perjury that the above is true and correct to the best of my knowledge.

                            _____/s/_____
                            Paul A. Richard
                            Special Agent
                            Federal Housing Finance Agency
                            Office of Inspector General

      Sworn to before me over the telephone and signed by me pursuant to Fed. R. Crim. P. 4.1 and 4(d) on this 22nd day of  August, 2023.  This application and warrant are to be filed under seal.

HONORABLE THOMAS S. HIXSON
UNITED STATES MAGISTRATE JUDGE